In re EPIC HOLDINGS, INC., Epic Healthcare Group, Inc., and Epic Healthcare Management Co., Relators.

In re Kenneth George, Relator.

Nos. 96–1131, 96–1133.

Supreme Court of Texas.

Argued on Oct. 9, 1997.

Decided Dec. 31, 1998.

Thomas S. Leatherbury, William D. Sims, Jr., Brian E. Robison, Scott W. Breedlove, Dallas, Robbi B. Hull, Richard D. Milvenan, Austin, Marie R. Yeates, Gwen J. Samora, Lawrence J. Fossi, Stephanie K. Crain, Houston, Lawrence J. Friedman, Dallas, for Relator.

Robert H. Mow, Jr., Bobby M. Rubarts, R. Matthew Molash, Hugh Bartley Sloan, Hughes & Luce, LLP, Dallas, for relator Kenneth George.

Jakes Jordaan, James E. Pennington, Mike McKool, Jr., Charles W. Cunningham, Gary J. Cruciani, Robert M. Greenberg, Roabert Elkin, Dallas, Lonny D. Morrison, Wichita Falls, Jennifer Horan Greer, Phillip T. Bruns, Robin C. Gibbs, Houston, for Respondent.

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice ABBOTT, Justice REX D. DAVIS (Assigned),[1] and Justice STEPHEN B. ABLES (Assigned)[2] join.

Three corporations and their former chief executive officer, defendants in certain pending litigation, contend in these two original mandamus proceedings that the lawyers representing plaintiff should be disqualified from doing so because they have violated Rule 1.09 of the Texas Disciplinary Rules of Professional Conduct, which provides in pertinent part:

(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

(1) in which such other person questions the validity of the lawyer's services or work product for the former client; [or]

\* \* \*

(3) if it is the same or a substantially related matter.

(b) [W]hen lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

(c) When the association of a lawyer with a firm has terminated, the lawyers who were then associated with that lawyer shall not knowingly represent a client if the lawyer whose association with that firm has terminated would be prohibited from doing so by paragraph (a)(1). . . . [3]

After hearing evidence from relators, the district court denied their motions to disqualify plaintiff's counsel. We conclude that plaintiff's counsel must be disqualified, and that the district court's refusal to grant relators' motions was a clear abuse of discretion for which relators have no adequate appellate remedy.

I

In the litigation out of which these original mandamus proceedings arise, plaintiff Vicki Anderson alleges that Kenneth George, while chief executive officer of EPIC Holdings,

---

1. Hon. Rex D. Davis, Chief Justice, Court of Appeals for the Tenth Court of Appeals District, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

2. Hon. Stephen B. Ables, District Judge, 216th Judicial District, and Presiding Judge, Sixth Administrative Judicial Region, sitting by commission of Hon. George W. Bush, Governor of Texas, pursuant to Section 22.005 of the Texas Government Code.

3. Tex. Disciplinary R. Prof.'l. Conduct 1.09, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (1998) (Tex. State Bar R. art. X, § 9).

Inc., and two other directors of that corporation breached their fiduciary duties by exorbitantly compensating themselves and other executives in connection with the acquisition of EPIC Holdings' by HealthTrust, Inc.-The Hospital Company. Anderson also alleges that HealthTrust conspired to assist the directors in their self-dealing in order to gain their approval of the acquisition.

George has moved to disqualify Anderson's legal counsel under Rule 1.09, contending that the pending case is substantially related to matters in which their former law firm, Johnson & Gibbs, represented George and an EPIC Holdings' subsidiary, EPIC Healthcare Group, Inc., and that Anderson's counsel are questioning the work Johnson & Gibbs did for George and EPIC Healthcare. These two EPIC companies and another EPIC Holdings' subsidiary, EPIC Healthcare Management Company, none of which is presently named as a defendant in Anderson's lawsuit, have intervened in that suit to move to disqualify Anderson's counsel for the same reasons urged by George. Anderson denies that her lawyers have violated Rule 1.09 and counters that relators have waived their disqualification claims. Following the district court's denial of the motions to disqualify, George and the three EPIC companies initiated the mandamus proceedings now before us. Before we set out in more detail the parties' contentions here, we recount, first, the events that led to the pending litigation and the issues raised by the motions to disqualify, and then the proceedings in the courts below.

## A

In 1988, American Medical International, a for-profit hospital company, decided to divest itself of more than thirty of its lower revenue-producing hospitals and offered Kenn George, a senior vice president, the opportunity to become chief executive officer of the new corporation formed to acquire the hospitals. George accepted the offer and recruited two other AMI vice presidents, Marliese E. Mooney and Thomas T. Schleck, to go with him. The new company was to be owned largely by its several thousand employees through common stock allocated to their retirement income accounts as permitted by the federal Employee Retirement Income Security Act.[4] Vesting ownership in its employees afforded the new company favorable treatment under federal tax laws, strong incentives for employee industry and loyalty, and good publicity.

The new corporation, EPIC Healthcare Group, Inc., acquired the hospitals from AMI in exchange for cash, notes, preferred stock, and assumption of debt. EPIC Healthcare's common stock was issued to an employee stock ownership plan—an "ESOP"—for cash borrowed from various lenders. The ESOP's stock was pledged to secure these loans. Each year EPIC Healthcare contributed retirement benefits to the ESOP that were equal to the principal and interest payments on the loans. As the ESOP used the contributions to pay down the debt, the stock was released and allocated to individual employees' retirement accounts. Some of AMI's preferred stock was convertible to common stock, and EPIC Healthcare could issue common stock for other purposes. But even when the ESOP's interest was fully diluted, it would remain the majority owner of EPIC Healthcare.

The ESOP stock was voted by a trustee. Employees to whose accounts stock was allocated were entitled to direct the trustee's vote of that stock—a right referred to as "pass-through voting"—but only on certain fundamental matters such as mergers and liquidations, not on election of directors. In voting for directors, and in voting the stock that remained pledged as security, the trustee was subject to direction by the committee overseeing the plan. The members of the ESOP Committee, as well as the trustee, were named by EPIC Healthcare's board of directors, which was always dominated by George and his management team. The directors' control of the ESOP trustee through the ESOP Committee gave them complete control of the corporation, even though they owned no stock themselves. In 1991, employees' pass-through voting rights were enlarged to include election of EPIC

---

4. 29 U.S.C. §§ 1001–1461 (1994).

Healthcare's directors, and in later years the preferred stock AMI held was converted to common stock and EPIC Healthcare issued common stock to others besides the ESOP. Even with these changes, however, there could be no serious threat to the directors' effective control of the corporation until almost all the ESOP's stock was allocated to individual employees' retirement accounts, thereby giving the employees the right to vote a majority of EPIC Healthcare's outstanding stock.

George and his senior management were employed by EPIC Healthcare Management Company, a wholly owned subsidiary of EPIC Healthcare. Incentive compensation, mostly to senior executives, was provided in the form of stock appreciation rights— "SARs"—convertible to cash or stock under certain conditions. SARs minimized the tax consequences of the incentive compensation to George and the other executives. The SAR plan was administered by a committee appointed by EPIC's board and thus controlled by George.

We have described only those basic elements of EPIC Healthcare's structure necessary to place in perspective the issues before us. Our brief summary belies the complexity of the transaction. The formation of EPIC Healthcare necessitated the assistance of sophisticated legal counsel experienced in many different areas of law: corporate, tax, securities, banking, ERISA, labor, real estate, and health law. George interviewed several Dallas law firms and selected Johnson & Swanson, later named Johnson & Gibbs and still later, Johnson & Wortley. Like the parties, for simplicity we refer to the firm in all its incarnations as Johnson & Gibbs.

To work on the transaction, the firm assigned more than twenty attorneys coordinated by Jim Watson, a firm shareholder. Watson and Michael G. Frankel, another shareholder, advised George on his employment agreement. Frankel also worked on the SAR plan. William B. McClure, Jr., also a shareholder, drafted the ESOP documents, including the trust agreement and the loan documents, and advised George on how the ESOP was to be administered. Associate attorney Jakes Jordaan spent 785 hours on the matter, mostly devoted to writing, revising, and issuing EPIC Healthcare's registration statement. Another associate, Jeffrey Carter, worked on Medicare issues, although his exact role is unclear. Johnson & Gibbs also advised George on the selection of the ESOP trustee, counseling him not to choose the person AMI nominated but to look for someone more independent. Johnson & Gibbs approved George's ultimate selection. The firm also assisted in preparing the handbook providing employees with a summary description of the ESOP, something required by ERISA. Johnson & Gibbs billed over $2.2 million for four months' work in setting up EPIC Healthcare, and an additional $2.3 for handling other matters for the company over the next three years. According to Frankel, EPIC was probably Johnson & Gibbs's largest client in 1988 and a substantial client thereafter. Johnson & Gibbs continued to represent EPIC until it was acquired by HealthTrust in 1994.

Jordaan left Johnson & Gibbs in 1990 and formed his own firm, Jordaan, Howard & Pennington. The next year Mike McKool, Jr., who had been on Johnson & Gibbs's board of directors for nearly a decade, also left to form his own firm, McKool Smith. Four other Johnson & Gibbs lawyers accompanied McKool: Charles W. Cunningham, Gary J. Cruciani, Jeffrey Carter, and Michael Piazza.

In 1992, EPIC Holdings, Inc. was formed to acquire EPIC Healthcare as a wholly owned subsidiary, to purchase some of AMI's preferred stock, and to facilitate conversion of other EPIC Healthcare preferred stock to common stock. In the transaction an AMI representative, Alan J. Chamison, became a director of EPIC. The ESOP received the same proportion of EPIC Holdings' common stock as it held in EPIC Healthcare's common stock. Because the parties do not distinguish, for purposes of this proceeding, between the EPIC company relators—EPIC Holdings, EPIC Healthcare, and EPIC Management—we hereafter refer to them together simply as EPIC.

In January 1994, EPIC's directors agreed to a plan of merger with another hospital holding company, HealthTrust, Inc.-The Hos-

pital Company, as a result of which EPIC would become a wholly owned subsidiary of HealthTrust. EPIC shareholders, including employee retirement accounts, would be paid for their stock, and the ESOP would be extinguished. HealthTrust agreed to pay some $277 million to acquire EPIC's stock, and to assume EPIC's indebtedness of some $727 million. Thus, HealthTrust and EPIC announced that the transaction involved more than $1 billion.

By this time, the ESOP owned about sixty percent of EPIC's outstanding shares, and a majority of the ESOP's shares had been allocated to employees' retirement accounts. The stock that remained pledged, plus AMI's stock, constituted a majority of the outstanding shares. In the merger negotiations with HealthTrust, the ESOP trustee took the position that he was both entitled and obliged to evaluate the benefits to the shareholders without direction from either the ESOP Committee or the individual employees that had received stock allocations. Before voting with AMI and other EPIC shareholders to approve the transaction with HealthTrust, the trustee insisted on and obtained various terms.

One condition of the transaction was that George and twelve other EPIC executives resign their employment. For release of their contractual rights, including severance and SAR payments, HealthTrust paid the executives over $42 million, a little more than half of which went to George. HealthTrust also agreed to indemnify the executives from any excise tax liability for the payments, up to $6 million.

### B

On April 29, 1994, a few days before the transaction was to close, Vicki Anderson, an employee to whose retirement account the ESOP had allocated stock, sued EPIC, its five directors, and HealthTrust, to enjoin the merger and recover damages.[5] Anderson's core complaint is that George and other executives, at the expense of EPIC shareholders, obtained payments for their severance rights

and SARs far in excess of anything to which they were entitled. HealthTrust went along with the payments, Anderson alleges, to "bribe" George and the other directors to sell EPIC for much less than it was worth, and the ESOP trustee voted for the transaction because George and other EPIC directors threatened and intimidated him. Anderson complains that employees were never told of the 1991 change in their pass-through voting rights, and that the 1994 proxy materials soliciting shareholder approval of the merger did not disclose the self-dealing of EPIC's directors, misrepresented the ESOP trustee's role in the transaction, failed to state that AMI had sued to stop an earlier proposed merger of EPIC and HealthTrust, and did not explain the merger's true impact on EPIC's employees.

A little over an hour after suit was filed, the district court issued a temporary restraining order prohibiting consummation of the merger. A few days later defendants removed the case to federal court. To obtain Anderson's withdrawal of her opposition to closing the transaction, HealthTrust agreed that it would assign her, or cause EPIC to assign her, whatever claims EPIC had against its directors and HealthTrust arising out of the actions and events described by Anderson in her original petition. The merger transaction then closed. Anderson later amended her petition to include claims on behalf of EPIC and to drop EPIC as a defendant.

Anderson's suit was filed by attorney James E. Pennington, a member of the law firm of Jordaan, Howard & Pennington. Johnson & Gibbs lawyers representing EPIC in the merger knew of the connection between Pennington and Jordaan, but the lawyer representing EPIC and its former directors in the lawsuit, Jerry R. Selinger, did not, and therefore he did not realize at first that Pennington might be disqualified from representing Anderson. Over the next four months, while little activity occurred in the case, Pennington's firm and McKool Smith agreed to represent Anderson jointly, shar-

---

**5.** Defendants contend that Anderson lacks standing to sue individually and that her claims are preempted by ERISA and outside the jurisdiction of the state courts. We express no opinion on these issues.

ing equally in the work and in any fees awarded. On September 2, 1994, Charles W. Cunningham, a shareholder at McKool Smith who had been a Johnson & Gibbs shareholder when EPIC was formed, entered an appearance on Anderson's behalf. Selinger immediately recognized the connection between the McKool firm and Johnson & Gibbs, and raised the issue of whether Anderson's counsel were disqualified.

Over the next several months the parties exchanged correspondence on the disqualification issues, each requesting information from the other on the subject. In essence, EPIC and its former directors argued: that Johnson & Gibbs had represented both EPIC and George; that attorneys Jordaan and Carter had even worked on the formation of EPIC themselves; that the formation of EPIC was substantially related to Anderson's claims; that Anderson's suit was adverse to EPIC and George; that Anderson's counsel could not represent her without revealing confidential information acquired through the representation of EPIC and George; and that Anderson could not prosecute her claims in the lawsuit without questioning the validity of Johnson & Gibbs's services or work product for EPIC and George. Anderson took the position: that Johnson & Gibbs had represented only AMI, not EPIC or George, in the formation of EPIC; that Jordann had worked only on EPIC's registration statement after EPIC was formed; that Carter could not be shown to have worked on EPIC's formation; that Anderson's claims were unrelated to the work done to form EPIC; that there was no reasonable probability that Anderson's counsel would divulge confidential information obtained through forming EPIC; and that while Anderson would explore Johnson & Gibbs's work in forming EPIC, she intended to rely on, not question, that work and to complain only of events after 1992. On October 20, 1994, Anderson's counsel wrote to EPIC's counsel: "We don't see any allegations in the petition that reasonably can be construed as a challenge to the 1988 creation of EPIC, the SAR Plan, or the employment contracts."

At first, EPIC and its former directors did not insist on disqualification, nor did Anderson's counsel absolutely reject the possibility that disqualification might be required. Rather, both sides explored the subject at length and in good faith before solidifying their positions. George's counsel later stated that EPIC and its former directors realized by December 1994 that Anderson's counsel would not withdraw, although EPIC and George now say that Anderson's counsel did not unequivocally refuse to withdraw until March 1995, after attempting to undertake discovery. In any event, EPIC filed a motion to disqualify Anderson's counsel on March 31, 1995, and George and the other defendant directors filed a similar motion on April 3. Days later, the federal court remanded the case to state court without ruling on the motions. On April 27, EPIC and its former directors filed in state district court a joint motion to disqualify Anderson's counsel, and Anderson filed a second amended petition which, as already noted, did not name EPIC as a defendant. George and others then filed an amended motion to disqualify. EPIC, no longer a party, did not join in the amended motion and abandoned its own motion. In June 1995 the district court heard the movants' evidence and, without hearing Anderson's evidence, denied the motion to disqualify.

Trial began on June 3, 1996. As Anderson's case began to unfold, its cast was distinctly critical of Johnson & Gibbs's work in forming EPIC, as we explain below. On June 17, the tenth day of trial, George and the other defendant directors renewed their motion to disqualify Anderson's counsel, based on the way they had conducted her case. Without ruling on the motion, and apparently for reasons unrelated to it, the district judge granted defendants' motion for a mistrial and recused herself from the case. The case was transferred to another court. On July 12, EPIC intervened in the case for the purpose of moving to disqualify Anderson's counsel.

The district court heard the motions to disqualify on October 29, 1996. After hearing argument for all parties, but before hear-

ing evidence, the court denied the motions, indicating that it believed that the grounds asserted for disqualification either had been raised previously and ruled on, or had not been timely raised and were waived. However, after allowing the movants to make bills of exception, the court admitted the evidence and denied the motions on their merits. Anderson presented some evidence at the hearing, but she understandably desisted when the court announced that it would rule in her favor.

George and EPIC separately sought review by mandamus, first unsuccessfully in the court of appeals, and then in this Court. We granted the petitions on June 12, 1997, with JUSTICE ENOCH recusing himself.[6] The Court heard argument on October 9, 1997, and a few days later, before the case could be decided, JUSTICE CORNYN resigned his office and JUSTICE HANKINSON was appointed to the Court in his place. JUSTICE HANKINSON also recused herself from participating in the decision of the case. The CHIEF JUSTICE certified the fact of the recusals to the Governor, who thereupon commissioned the Honorable Rex D. Davis, Chief Justice of the Court of Appeals for the Tenth District of Texas at Waco, and the Honorable Stephen B. Ables, Judge of the 216th District Court in Kerrville and Presiding Judge of the Sixth Administrative Judicial Region of Texas, to hear and decide the case.[7]

## II

We have repeatedly observed that "[t]he Texas Disciplinary Rules of Professional Conduct do not determine whether counsel is disqualified in litigation, but they do provide guidelines and suggest the relevant considerations."[8] George makes an argument apart from the disciplinary rules that what he calls Anderson's counsel's "side-switching" creates an appearance of impropriety. But as we said at the beginning, George and EPIC focus their arguments on Rule 1.09, and we think George's more general argument is fairly comprehended by the considerations supplied by that rule. Consequently, we analyze the elements of the rule and then consider whether disqualification of any or all of Anderson's legal team is required.

## A

Anderson concedes that Jakes Jordaan, Jeffrey Carter, and other Johnson & Gibbs lawyers personally represented EPIC in 1988, but she argues that none of the lawyers in that firm represented George in that time period. Anderson points out that no 1988 documents identify George as a client of any attorney at the firm, that firm documents show "Newco"—the firm's name for EPIC Healthcare—as the client at that time, that a former Johnson & Gibbs shareholder, Winston Walp, testified that EPIC was the firm's client in 1988, and that AMI paid the bills for the work done to form EPIC. These facts are direct evidence that Johnson & Gibbs represented EPIC and AMI, but they say nothing about whether the firm *also* represented George individually. The fact that AMI paid the firm's bills does not suggest that EPIC was not also a client; indeed, Anderson's own direct evidence is to the contrary. Neither does AMI's responsibility for paying Johnson & Gibbs's fees suggest that George was not also represented by the firm. Nor does Walp's testimony that EPIC was the client, as shown in firm records, suggest that AMI, who paid the bills, was not, or that George was not. The evidence to which Anderson points neither proves, nor supports an inference, that Johnson & Gibbs attorneys did not personally represent George in 1988.

Anderson does not argue that a conflict of interest would have prevented Johnson & Gibbs from representing George individually as well as AMI and EPIC, and there is no evidence that any such conflict, if one existed, was not waived. AMI's and EPIC's interests

---

6. 40 TEX. SUP.CT. J. 628 (June 12, 1997).

7. TEX GOV'T CODE § 22.005.

8. *National Medical Enterprises, Inc. v. Godbey,* 924 S.W.2d 123, 132 (Tex.1996) (citing *Henderson v. Floyd,* 891 S.W.2d 252, 254 (Tex. 1995) (per curiam); *Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990); and *Ayres v. Canales,* 790 S.W.2d 554, 556 n. 2 (Tex. 1990)).

in 1988 were similar but they were not congruent. Disagreement arose, for example, over who should be the ESOP trustee and how independent he should be from AMI's influence. Nothing in the record we have indicates that AMI or EPIC considered any disagreements they had to pose a conflict preventing their representation by the same firm, or that Johnson & Gibbs was precluded from also representing George personally.

The only evidence in the record before us—some of it adduced by Anderson herself—is that the firm did represent George individually in setting up EPIC. At trial, attorney Cunningham asked attorney Watson, testifying as an adverse witness, whether he had "represented Kenn George personally in connection with the formation of EPIC" in 1988, to which Watson answer, "That's correct." Later, attorney McKool examined George as follows:

Q And when EPIC was being set up, that's when you hired the corporate lawyers from the firm of Johnson & Gibbs; is that right?

A Correct.

Q And I'm not going to go back into the details, but the lead lawyer for that group was the Mr. James Watson that we saw here for several days this week; is that not right?

A Correct.

Q And it's true, isn't it, that those lawyers helped you structure every line, sentence, and paragraph of your employment contract?

A Those lawyers drafted every line, sentence, and paragraph in the contract, correct.

Q And when they did it, they were representing you personally, weren't they?

A That's what I thought.

Attorney McKool even told the jury in his opening statement that "[t]he evidence will be that every word of Kenn George's employment agreement was drafted by this personal lawyer, representing both him personally and the company." Attorney McClure testified at the October 1996 hearing on the motions to disqualify that he advised George in negotiating the ESOP documents.

We think that when an attorney performs legal services benefitting a person individually who is regarded by both the attorney and the person as a client, the existence of an attorney-client relationship cannot be challenged by a third party. To allow one member of a law firm to dispute the existence of an attorney-client relationship acknowledged by another member of the same firm would put a client at a serious disadvantage in dealing with the firm. Members of a law firm cannot disavow access to confidential information of any one attorney's client.

> There is, in effect, an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm. One reason for this presumption is that it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences. Another reason for the presumption is that it helps clients feel more secure. Also, the presumption helps guard the integrity of the legal practice by removing undue suspicion that clients' interests are not being fully protected.[9]

To allow members of a firm to dispute another member's assertion of an attorney-client relationship with a person would open an avenue for circumventing the presumption protecting client confidences. Even though access to confidential information could not be denied, existence of the protected relationship could be.

Here, not only is the evidence uncontradicted that Johnson & Gibbs attorneys personally represented George as well as EPIC in 1988, Anderson herself took that position at trial. At the October 1996 hearing McKool explained that his statement to the jury of what the evidence would show about Johnson & Gibbs's personal representation of George was merely a recitation of the testimony he expected, not an endorsement of it. But this is not the fair import of his statement to the jury or his examination of George. McKool undertook to prove his for-

---

**9.** *National Medical Enterprises,* 924 S.W.2d at 131 (citations omitted).

mer firm's personal representation of George, not to dispute it. The firm's representation of George was not limited to drafting his employment agreement and the SAR plan. George was the person most intimately involved in every aspect of forming EPIC, from choosing legal counsel to choosing the ESOP trustee. Defining management's role was crucial to EPIC's entire operation and an inseparable part of the legal work done to set up the corporation. We thus conclude that the Johnson & Gibbs lawyers who served on the legal team to form EPIC in 1988 personally represented not only EPIC but George.

### B

█ Unquestionably, EPIC and George have not consented to the participation of Anderson's counsel in the pending litigation, and the litigation is adverse to George. But Anderson argues that the litigation cannot be adverse to EPIC because she is suing in part on claims EPIC assigned her. EPIC counters that it has contracted to indemnify George and the other directors against liability for claims against them arising out of their management roles, and to pay a portion of the legal fees incurred in defending such claims. Anderson responds that the defendant directors may not be entitled to enforce their contractual indemnification rights if they are found liable for the self-dealing she alleges in her pleadings. Assuming Anderson is correct, the directors would nevertheless be entitled to payment of legal fees as provided in the indemnification agreements if Anderson should not prevail. This liability is not merely hypothetical. The unchallenged evidence in the record is that EPIC has already become indebted for part of the substantial legal fees defendants have incurred in this litigation. Anderson argues that responsibility for the fees is really HealthTrust's because it assumed EPIC's indemnification obligations. But HealthTrust's responsibility is clearly in addition to, not in lieu of, EPIC's; the directors have never released EPIC from the indemnification agreements.

"Adversity," we have explained, "is a product of the likelihood of the risk [that a lawsuit poses to a person's interests] and the seriousness of its consequences."[10] Anderson's lawsuit poses the almost certain risk to EPIC of either being liable for a part of the defendants' legal fees, already a substantial sum, or incurring its own legal expense in an effort to avoid such liability, or both. Accordingly, we conclude that Anderson's lawsuit is adverse to EPIC as well as George.

### C

█ EPIC and George contend that Anderson's claims in her lawsuit are substantially related to matters involved in EPIC's formation, and that Anderson has questioned the validity of Johnson & Gibbs's services and work product in those matters. Anderson argues in response that her claims focus on events occurring after 1992 and unrelated to the legal work done in 1988. She does not question the validity of that work, she says, but on the contrary, affirms it as setting the corporate context for the defendant directors' misconduct.

A claim that a corporate officer has breached his fiduciary duty to the corporation is not, in and of itself, related to legal work done to form the corporation, and does not necessitate a challenge to that work. Indeed, corporate counsel may be best suited to prosecute such a claim. But there is more to Anderson's claim than this. Anderson contends that in forming EPIC, a "circle of power" was created that allowed George and other directors to perpetuate their control of the corporation despite the fact that they owned no stock. EPIC's directors named the ESOP Committee, which directed the ESOP trustee in voting the stock not yet allocated to employee retirement accounts and, until 1991, even directed the ESOP trustee in voting the allocated stock in the election of directors. EPIC's directors also named the ESOP trustee. Only when the ESOP's allocated stock and the stock issued to others constituted a majority of the outstanding shares could the directors' control of the corporation be challenged. Anderson

---

**10.** *National Medical Enterprises,* 924 S.W.2d at    132.

claims that George and the other directors misused and abused this control to cause themselves to be paid more than EPIC owed them in connection with the merger with HealthTrust. Defendants contend that George and the other directors were paid only what they were due.

Anderson's claims are thus related to Johnson & Gibbs's work in 1988. They pose a basic issue of whether George and the other directors acted as it was contemplated they would when EPIC was formed or whether, instead, they abused their power. Whether the relationship between Anderson's claims and Johnson & Gibbs's work is substantial enough to invoke Rule 1.09 concerns, or whether the validity of the work done in forming EPIC is put in question, cannot be determined from Anderson's pleadings or pretrial discovery alone. Thus, the district court correctly rejected the argument in EPIC's former directors' original motions for disqualification—an argument made by EPIC in its original motion, too, before Anderson dismissed it from the suit—that Rule 1.09 problems were unavoidable. George himself now concedes that "[i]t may well be that, before trial, Anderson's counsel had every intent of trying a case that never would have questioned the 1988 Johnson & Gibbs work—just as they represented at all times prior to trial." But the fact that Anderson *could* prosecute her claims without Rule 1.09 implications does not mean that she *would* do so, or that she could do so effectively.

As trial began, the approach of Anderson's counsel was clearly critical of matters prior to 1993. In his opening statement, McKool was critical not only of what George and others were paid in connection with the HealthTrust transaction, but of the amount of George's compensation throughout EPIC's existence. George's compensation before the merger was "not what we're complaining about here", McKool told the jury, but was nevertheless, in his words, "relevant and very telling to the issues in this case". During voir dire attorney Cunningham addressed the venire as follows:

> [A]s this lawsuit unfolds, you're going to see that we're going to have to challenge pretty strongly Mr. Watson and some of the things that went on that we take issue with. Have any of you been involved in having to confront or challenge people that you've worked with before that you think have been involved in something that is not right?

When a member of the venire expressed difficulty with the idea that a lawyer could criticize work done by his partner while they were partners, Cunningham assured her that Anderson's claims related only to events in 1994. Anderson herself later testified on direct examination that she had no complaint about the way EPIC was structured in 1988. But mere disavowals cannot contradict what actually happened. Cunningham stated in voir dire that attorney Watson, who headed the Johnson & Gibbs team that formed EPIC, would be "a central feature of this lawsuit". What that meant, as Cunningham's lengthy, grueling, and sometimes heated cross-examination of attorney Watson revealed, was that Anderson contended that Watson was the architect of a structure that allowed George to abuse EPIC's employees.

We have held that two matters are "substantially related" within the meaning of Rule 1.09 when a genuine threat exists that a lawyer may divulge in one matter confidential information obtained in the other because the facts and issues involved in both are so similar.[11] Such a threat exists here, when information Johnson & Gibbs lawyers obtained from George and EPIC in 1988 may be relevant in the prosecution of Anderson's claims. An actual disclosure of confidences need not be proven; the issue is the existence of a genuine threat of disclosure because of the similarity of the matters.[12]

---

11. *Texaco, Inc. v. Garcia*, 891 S.W.2d 255, 256–257 (Tex.1995) (per curiam) (citing *NCNB Texas Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989)); *Metropolitan Life Ins. Co. v. Syntek Finance Corp.*, 881 S.W.2d 319, 320–321 (Tex. 1994) (per curiam); *see also* Tex. Disciplinary R. Prof'l Conduct 1.09, cmt. 4B, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G app. A (1998) (Tex State Bar R. art. X, § 9).

12. *Texaco*, 891 S.W.2d at 257.

At the October 1996 hearing on the disqualification motions, EPIC and its former directors offered the opinions of two experts on legal ethics that Anderson's counsel should be disqualified under Rule 1.09. We need not consider this expert testimony, however, because the record of the trial proceedings determines whether Anderson questioned the validity of Johnson & Gibbs's services and work product in 1988, thereby making her claims substantially related to those matters involved in forming EPIC. The issue is a legal one. Having reviewed the trial record, we have determined that Anderson's counsel did question the work their former firm performed when they were still members of it, and that the relationship between that work and Anderson's claims as her counsel has chosen to prosecute them is substantial.

### D

We therefore conclude that Jordaan and Carter, who personally represented EPIC and George while at Johnson & Gibbs in 1988, are prohibited by Rule 1.09(a) from representing Anderson in her lawsuit against George and others because her claims are adverse to George and EPIC, are substantially related to matters on which they worked in 1988, and question the validity of Johnson & Gibbs's services and work product. Rule 1.09(b) prohibits all the lawyers in a firm from representing a client that any one of them could not represent because of Rule 1.09(a). Thus, Rule 1.09(b) would prohibit any member of Jordaan, Howard & Pennington and McKool Smith from representing Anderson.[13] Moreover, Rule 1.09(c) would prohibit any lawyer who was a member of the Johnson & Gibbs firm in 1988 from representing Anderson.

The question remains whether Anderson's counsel should be disqualified because their representation of Anderson is prohibited by Rule 1.09. We disqualified counsel based on this rule in *National Medical Enterprises, Inc. v. Godbey*,[14] and we believe the concerns embodied in the rule require the same result

here. The legal system's image is ill-served by lawyers criticizing the work of their former associates with whom they shared in the fees paid for the work. Also, it is most unfair for a client to be forced to defend the work of the former associates of his opponent's counsel. One member of the venire at the trial proceedings voiced this reaction to Anderson's counsel's characterization of how the case would be conducted. The provisions of Rule 1.09 serve not only to set standards for attorney conduct but to protect the integrity of legal proceedings. We conclude that Anderson's counsel should be disqualified.

### III

Anderson makes two procedural arguments against disqualification. One is that EPIC and George have waived the grounds they assert for disqualification by failing to assert them earlier. The other is that Anderson was not given an opportunity to present evidence against disqualification. We address each in turn.

### A

As a rule, "[a] party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint."[15] Anderson argues that EPIC and George waived disqualification of her counsel by waiting over four months after suit was filed to raise the issue and seven more months to file their motions. We think EPIC and George have satisfactorily explained these delays. For four months after Anderson filed suit defendants' counsel was unaware of the connection between attorney Pennington's firm and Johnson & Gibbs. Johnson & Gibbs, who was representing EPIC in the HealthTrust merger, recognized the connection but did not communicate it to defendants' litigation counsel. Anderson concedes that during the last four months of 1994 the parties were exchanging information and correspondence in an effort to identify and resolve disqualification issues but argues that defendants should have filed their motions at

---

13. *National Medical Enterprises*, 924 S.W.2d at 131; *Henderson*, 891 S.W.2d at 254.

14. 924 S.W.2d 123 (Tex.1996).

15. *Vaughan v. Walther*, 875 S.W.2d 690, 690 (Tex.1994) (per curiam).

least three months before they did. From the record it appears to us, however, that the parties persisted in their efforts to resolve the issues they could before discovery commenced, at which point defendants immediately filed their motions. It is of some importance that in the eleven months before the motions to disqualify were filed almost no discovery was conducted except on disqualification issues. The delay in filing the motions did not prejudice Anderson's prosecution of her claims.

More importantly, the information available to defendants at any time prior to trial did not establish that Anderson's counsel should be disqualified under Rule 1.09. As we have already explained, the pleadings and discovery prior to trial did not establish that Anderson's claims were so substantially related to the work done in 1988 to form EPIC as to raise Rule 1.09 concerns, or that prosecution of those claims would question the validity of that work. Only at trial did it become apparent that Anderson's approach would be critical of Johnson & Gibbs's work in 1988. George and the other defendant directors filed their motion during trial, and EPIC intervened and filed its motion a few days later. Both motions were based on the events at trial, and both were timely.

The district court refused to find that EPIC or George waived grounds for disqualification, and in this we conclude that court was correct.

**B**

After hearing arguments on the motions to disqualify, the district court indicated that defendants' contentions were not sufficiently different from those George had raised unsuccessfully a year earlier to warrant reconsideration of the matter. The court therefore denied the motions without hearing evidence. It properly permitted defendants to adduce evidence in a bill of exceptions, and defendants did so. Anderson was, of course, not obliged to examine the witnesses defendants called as part of their bill, and she did not do so. When the bill was completed, the district court changed course, admitted the evidence, and denied the motions on their merits. Anderson did

offer a few exhibits before the court's ruling, but she understandably did not insist on a full evidentiary presentation to a court that had evidenced a definite intention to rule in her favor. Now before us Anderson argues that her counsel should not be disqualified before she has had a full opportunity to present her evidence.

Anderson's argument would be compelling except that as we have resolved the issues, no further evidence is necessary. We have held that Watson's unequivocal and repeated acknowledgment that George was his client cannot be impeached by a third party, including his former partners and associates, when his work undisputedly benefitted George individually and George himself testified that he was Watson's client. Moreover, Anderson herself took the position at trial that Johnson & Gibbs represented George in 1988. Our conclusion that Anderson's action is adverse to EPIC is based on indemnification agreements in the record. Anderson does not contend that these agreements are for some reason wholly invalid or unenforceable; she argues only that George and the other directors may not be entitled to indemnification for self-dealing. But as we have shown, the mere possibility that EPIC may eventually escape liability does not alleviate the present adversity of Anderson's action. Our determination that Anderson's claims raise Rule 1.09 problems requiring disqualification is a legal one, not a factual one, based entirely on the trial record. Likewise, our conclusion that George and EPIC did not waive the grounds they assert for disqualification is based entirely on the written record of the proceedings below and does not involve factual disputes. In sum, further evidence could not affect resolution of these issues.

**IV**

We need respond to the dissent only briefly.

The dissent would hold that EPIC waived the grounds asserted in its July 1996 motion for disqualification because it raised essentially the same issues in its March 1995 motion, which it abandoned before the hearing. If nothing had changed in the interven-

ing period, we might agree, but as we have explained, Rule 1.09 concerns were not necessarily raised by Anderson's pleadings and discovery and did not become critical until Anderson began to present her case at trial. We do not understand how EPIC's failure to urge a motion that should have been denied can prohibit it from later reurging the motion when it should have been granted.

The dissent also argues that factual disputes prevent us from determining whether George was Johnson & Gibbs's client in 1988, and whether at trial Anderson questioned the validity of Johnson & Gibbs's work. But Anderson conceded that Johnson & Gibbs represented George personally, removing any possible factual dispute on the issue. Moreover, there is evidence that Johnson & Gibbs represented AMI and EPIC, and evidence that Johnson & Gibbs represented George individually, but there is no evidence that the firm did not represent George individually. The fact that AMI and EPIC were firm clients does not mean that George was not. Whether Anderson questioned the validity of Johnson & Gibbs's work must be determined from the trial record. It says what it says, and its assessment is thus a legal question.

## V

■■■ Mandamus relief is available to correct a clear abuse of discretion for which there is no adequate remedy at law. Anderson's counsel should have been disqualified, and the district court's denial of EPIC's and George's motions was a clear abuse of discretion. We held in *National Medical Enterprises v. Godbey*[16] that appeal of the denial of attorney disqualification does not adequately remedy the injury to the parties in having to defend the litigation involving Rule 1.09 concerns, or the injury to the legal profession. The same is true in the present case.

\* \* \* \* \*

For the reasons we have explained, we conclude that Jordaan, Howard & Penning-

ton and McKool Smith must be disqualified in the pending action. We are confident that the district court will promptly comply, and our writ of mandamus will issue only if that confidence proves misplaced.

Justice BAKER filed a dissenting opinion in which Justice GONZALEZ and Justice SPECTOR join.

Justice ENOCH and Justice HANKINSON did not participate in the decision.

Justice BAKER, joined by Justice GONZALEZ and Justice SPECTOR, dissenting.

This litigation is almost five years old. Today, in a case of first impression construing Rule 1.09(a)(1)of the Texas Disciplinary Rules of Professional Conduct,[1] the Court disqualifies plaintiff's counsel. Here, the Court clearly conducts a factual sufficiency review and judges the credibility of the evidence to conclude that the trial court erred in refusing to disqualify Anderson's attorneys. Reviewed under the proper mandamus standard, the record shows that Epic waived its complaint about disqualifying Anderson's attorneys and the trial court did not abuse its discretion in denying George's motion to disqualify. Because the Court applies improper standards in granting mandamus relief, I dissent.

## I. BACKGROUND

In 1988, American Medical International, Inc. (AMI), a hospital holding company, decided to spin off thirty-seven of its lower revenue hospitals to the employees of those hospitals. AMI used a stock option plan for the hospitals' employees to effectuate the spin-off. AMI selected Kenneth George, AMI's regional vice president, to head Epic Holdings, Inc., the new corporation for the spin off and to assemble a management team to operate Epic. George remained AMI's employee from the plan's origination through

---

**16.** 924 S.W.2d at 133.

**1.** Unless otherwise indicated, all rule references are to the Texas Disciplinary Rules of Professional Conduct.

Epic's formation when he became an officer and director of Epic.

George selected the law firm of Johnson & Gibbs to perform the necessary legal services to form Epic. Johnson & Gibbs assisted in securing the financing necessary to fund the transaction, prepared the necessary documents for the employee stock option plan, prepared the officers' and executives' employment compensation agreements, and prepared the necessary documents for the Securities and Exchange Commission. Epic was formed, and the initial closing occurred in September 1988. The SEC filings and the final financing arrangements were completed in early 1989. Johnson & Gibbs continued to provide legal services to Epic from Epic's formation in 1988 until Epic merged with HealthTrust, Inc.-The Hospital Company in 1994.

Jakes Jordaan, a former Johnson & Gibbs associate, worked directly on securities matters for Epic in 1988 and 1989. Jordaan left Johnson & Gibbs in 1990 and ultimately formed Jordaan, Howard & Pennington. Three other lawyers who worked for Johnson & Gibbs while it represented Epic, Mike McKool, Jr., Charles Cunningham, and Gary Cruciani, left Johnson & Gibbs in 1991 and formed McKool Smith. In 1993 and 1994, Epic negotiated with HealthTrust to sell its hospitals to HealthTrust and to merge with HealthTrust.

In April 1994, Anderson, a mid-level Epic manager, and the real party in interest here, brought a stockholder derivative suit against Epic, HealthTrust, and Epic's directors, including George. Anderson's suit alleged that the proposed merger between Epic and HealthTrust was unfair to the stockholders participating in the employee stock ownership plan. James E. Pennington of the Jordaan firm filed the Anderson suit. Anderson secured a temporary restraining order in state court preventing Epic and HealthTrust from closing their merger. Epic then removed Anderson's state court suit to federal court. In May 1994, in lieu of a preliminary injunction hearing, Anderson agreed to allow the merger to proceed and in exchange, Epic agreed to assign to Anderson, for the benefit of Epic's stockholders, its claims against

HealthTrust and the Epic directors arising out of the merger. Nevertheless, Epic remained a defendant.

On September 2, 1994, the former Johnson & Gibbs lawyers at the McKool firm appeared on Anderson's behalf. Counsel for Epic and George then wrote to the McKool firm suggesting that the McKool and Jordaan firms had a conflict of interest. Anderson's counsel responded that they saw no conflict, but were willing to examine the defendants' evidence of a conflict. Over the next several months, the lawyers exchanged a number of letters arguing the conflict issue. Epic and George alleged that because the McKool and Jordaan firms were representing Anderson, whose interests were adverse to Epic, there was a conflict. Epic and George also alleged that Anderson's liability theory was to disparage Johnson & Gibbs's work product generated when Johnson & Gibbs represented Epic in 1988 and 1989. The McKool firm denied that they were challenging any work product prepared before they left Johnson & Gibbs in 1991. Instead, the McKool firm asserted that it would challenge only the unfairness of the merger plan, which allegedly provided a less than fair market value sale price and unfairly benefitted Epic's officers and directors. Epic and George replied that their defense would put the 1988 and 1989 work product at issue.

Epic moved to disqualify Anderson's counsel in federal court on March 31, 1995. George and four other directors moved to disqualify Anderson's counsel in federal court on April 3, 1995. In that same month, the federal court remanded the case to state court without acting on the motions to disqualify. After remand to state court, Epic, George, and two other directors filed a joint motion to disqualify Anderson's counsel. In June 1995, the directors, including George, filed an amended motion to disqualify Anderson's counsel. Epic did not join in this motion.

On June 16 and 19, 1995, Judge Candace Tyson held an evidentiary hearing on the directors' motion to disqualify Anderson's counsel. After the hearing, Judge Tyson denied the directors' motion.

When the case against the directors went to trial in June 1996, the directors renewed their motion to disqualify Anderson's counsel on the grounds that Anderson's attorneys were attacking Johnson & Gibbs's work product. On June 20, 1996, without ruling on the directors' motion, Judge Tyson declared a mistrial. Shortly thereafter, Judge Tyson recused herself on her own motion.

The case was then transferred to another state district court. The directors' renewed motion remained pending. On July 12, 1996, Epic intervened in the underlying lawsuit and filed another motion to disqualify Anderson's counsel. Judge Hugh Snodgrass held a hearing that resulted in setting both disqualification motions for hearing on October 29, 1996. The day before the disqualification hearing, Epic filed an objection to Judge Snodgrass as a visiting judge under section 74.053 of the Texas Government Code.

At the beginning of the October 29 hearing, Judge Snodgrass overruled Epic's objection to him as a visiting judge and proceeded to hear the disqualification motions. After the parties' opening statements on the disqualification motions, Judge Snodgrass indicated he would deny the motions without hearing testimony. Judge Snodgrass stated he believed that both Epic and the directors had waived their right to disqualify Anderson's counsel. Judge Snodgrass initially refused to allow Epic and the directors to offer any testimony. However, after Epic and the directors made bills of exception, Judge Snodgrass changed his ruling and admitted into evidence the testimony and exhibits offered in the bills of exception. After hearing further argument from the parties, he denied both motions to disqualify. After the court of appeals denied mandamus, Epic and George filed for mandamus in this Court for relief from Judge Snodgrass's order.

## II. MANDAMUS

Mandamus is an extraordinary remedy available only in limited circumstances. *See Canadian Helicopters, Ltd. v. Wittig,* 876 S.W.2d 304, 305 (Tex.1994); *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A court should issue mandamus only to correct a clear abuse of discretion or the violation of a legal duty when there is no other adequate remedy at law. *See Canadian Helicopters,* 876 S.W.2d at 305; *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). The relator has the burden of showing an abuse of discretion as well as the inadequacy of appellate remedy. This burden is a heavy one. *See Canadian Helicopters,* 876 S.W.2d at 305; *Lutheran Soc. Serv., Inc. v. Meyers,* 460 S.W.2d 887, 889 (Tex.1970).

The test for abuse of discretion is not whether, in the reviewing court's opinion, the facts present a proper case for the trial court's action. Rather, the question is whether the trial court acted without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). To determine whether there is an abuse of discretion, we review the entire record. *See Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996). Our focus remains on the trial court's order regardless of the court of appeals' decision. *See Johnson,* 700 S.W.2d at 918. The party challenging the trial court's decision must establish that the facts and law permit the trial court to make but one decision. *See Johnson,* 700 S.W.2d at 917.

With respect to resolving factual issues or matters committed to the trial court's discretion, the reviewing court may not substitute its judgment for the trial court's. *See Walker,* 827 S.W.2d at 839. The reviewing court must defer to the trial court's resolution of factual issues, and may not set aside the trial court's finding unless the record makes it clear that the trial court could reach only one decision. *See Walker,* 827 S.W.2d at 839–40. The reviewing court may not issue mandamus for an abuse of discretion merely because it disagrees with the trial court's decision if that decision was within the trial court's discretionary authority. *See Beaumont Bank N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991).

Moreover, an appellate court may not reconcile disputed factual matters in a mandamus proceeding. *See Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 60 (Tex.1991); *Dikeman v. Snell,* 490 S.W.2d 183, 186–87

(Tex.1973). An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and some evidence reasonably supports the trial court's decision. *See Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978). An abuse of discretion does not exist if some evidence in the record shows the trial court followed guiding rules and principles. *See Morrow v. H.E.B., Inc.*, 714 S.W.2d 297, 298 (Tex.1986).

However, we accord much less deference to a trial court's determination of the legal principles controlling its ruling. A trial court has no discretion in determining what the law is or applying the law to the facts. *See Walker*, 827 S.W.2d at 840. Thus, the trial court's failure to analyze or apply the law correctly is an abuse of discretion and may result in mandamus relief. *See Walker*, 827 S.W.2d at 840; *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex.1989).

## III. WAIVER

Anderson asserts that Epic and George waived their right to seek her attorneys' disqualification. Anderson contends that the record shows that Epic abandoned its disqualification motion, and therefore, waived its right to complain about Anderson's attorneys. Anderson also contends that the record shows that George and the directors waited almost eleven months after they first knew or should have known of the alleged conflict of interest between Jordaan and Epic and the directors to file the disqualification motion. She contends that George and the directors knew of the alleged conflict in May 1994 when Jordaan's firm filed Anderson's suit against Epic and the directors and that this knowledge controls the waiver issue.

On the other hand, Epic and George maintain they have not waived their right to disqualify Anderson's counsel. They assert

that the disqualification grounds that Judge Snodgrass heard were different from the disqualification grounds that Judge Tyson denied. George asserts that the motion Judge Tyson heard focused on whether the directors' employment agreements were sufficiently related to Anderson's lawsuit under Rule 1.09(a)(3) [2], not on whether Anderson would attack the Epic formation documents. Specifically, Epic and George assert that they did not pursue a claim that Anderson and her attorneys would attack the formation documents under Rule 1.09(a)(1) because Anderson and her attorneys represented that they intended to challenge only the 1994 payments made to the directors and not Epic's creation in 1988. Epic and George assert that, nevertheless, when trial began in June 1996, Anderson challenged the formation documents. Epic and George contend that after Anderson's new attacks against the formation documents they promptly reasserted their motions to disqualify.

### A. APPLICABLE LAW

Waiver is an affirmative defense and applies to a motion to disqualify opposing counsel. *See Turner v. Turner*, 385 S.W.2d 230, 236 (Tex.1964). Waiver occurs when a party either intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right. *See Tenneco, Inc. v. Enterprise Prod. Co.*, 925 S.W.2d 640, 643 (Tex.1996); *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). A party may expressly renounce a known right and thereby waive that right. *See Tenneco, Inc.*, 925 S.W.2d at 643. A party's silence or inaction, for so long a period that it shows an intention to yield the known right, is also enough to prove waiver. *See Tenneco, Inc.*, 925 S.W.2d at 643. Waiv-

---

**2.** Rule 1.09 provides in part:

(a) Without prior consent, a lawyer who personally had formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

(1) in which such other person questions the validity of the lawyer's services or work product for the former client;

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by rule 1.10 [successive government and private employment], when lawyers are or have become members of or are associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a).

er is ordinarily a question of fact. *See Tenneco, Inc.*, 925 S.W.2d at 643. But when the facts and circumstances are admitted or clearly established, the question becomes one of law. *See Tenneco, Inc.* 925 S.W.2d at 643.

A party who does not file a motion to disqualify opposing counsel in a timely manner waives the complaint. *See Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466, 468 (Tex.1994); *Vaughan v. Walther*, 875 S.W.2d 690, 690 (Tex.1994). In determining whether the party has waived the complaint, the reviewing court should consider the time period between when the conflict becomes apparent to the aggrieved party and when the aggrieved party moves to disqualify. *See Spears*, 797 S.W.2d at 656; *Wasserman v. Black*, 910 S.W.2d 564, 568 (Tex.App.—Waco 1995)(orig.proceeding). The reviewing court should also consider any evidence that indicates the aggrieved party filed the disqualification motion as a tactical weapon for dilatory or other purposes. *See Grant*, 888 S.W.2d at 468; *Spears*, 797 S.W.2d at 658. Importantly, in making these determinations, a reviewing court cannot resolve the parties' conflicting factual assertions concerning waiver. *See Grant*, 888 S.W.2d at 468; *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex.1990).

### B. ANALYSIS

#### 1. Epic

Anderson's waiver arguments against Epic center on her claim that Epic waited too long, after learning of the alleged conflict of interest, to assert its motion to disqualify Anderson's counsel. Anderson points out that although Epic first knew of Jordaan's involvement when it was served in April 1994, Epic did not hint of any alleged conflict until it removed the case to federal court and the McKool firm entered its appearance. Epic then delayed another seven months before moving to disqualify Anderson's counsel.

Anderson further argues that Epic abandoned its motion to disqualify by not joining and urging disqualification in the directors'

second amended motion to disqualify Anderson's attorneys heard by Judge Tyson in June 1995. The record clearly reflects, and Epic does not dispute, that only George and the directors [3] pursued disqualification in June 1995. Epic counters that it temporarily abandoned its disqualification efforts only because Anderson and her attorneys represented that Anderson would not challenge any aspect of Epic's 1988 formation. However, the representations Epic cites (two letters from the McKool firm, a response to a request for admission, and a statement in a trial brief) either occurred well before Epic filed its initial motion for disqualification or after it had abandoned its disqualification efforts in Judge Tyson's court. These undisputed facts undercut Epic's arguments that it abandoned its initial motions in reliance on these representation and show that Epic abandoned its initial disqualification efforts in June 1995. Epic thereby waived its right to complain about Anderson's lawyers by waiting over a year—until its July 1996 intervention—to renew its disqualification efforts. *See Tenneco, Inc.*, 925 S.W.2d at 643; *Grant*, 888 S.W.2d at 468.

Epic asserts that it should be excused from abandoning its original efforts to disqualify Anderson's attorneys because its renewed disqualification motion in July 1996 urged a new basis for disqualification. Epic asserts that its new basis—that Anderson's attorney should be disqualified under Rule 1.09(a)(1)(challenging earlier work product)— was not available to Epic until after the 1996 mistrial. I would reject this argument. Despite the fact that Epic brought its original motions under Rule 1.09(a)(3)(regarding substantially related matters), the thrust of Epic's original argument was that the two matters were substantially related because Anderson was challenging Johnson & Gibbs's work product in forming Epic in 1988. For example, in its original motion, Epic argued that Anderson was challenging the 1988 stock incentive program and the 1988 employment agreements, including the directors' compensation package. Thus, even though Epic's original motions were not ex-

---

**3.** As previously noted, earlier Epic had joined George and the directors in a joint amended motion to disqualify Anderson's attorneys. However, Epic was not a movant in the directors' amended motion that Judge Tyson heard in June 1995.

pressly based on Rule 1.09(a)(1), that ground was certainly available, and indeed Epic raised it. After abandoning its initial efforts and arguments for disqualification, Epic should not be allowed to raise essentially the same arguments one year later. *See Tenneco, Inc.*, 925 S.W.2d at 643; *Grant*, 888 S.W.2d at 468. Accordingly, based on this record I would hold that Epic abandoned its right to complain about disqualifying Anderson's attorneys and deny Epic any relief.

### 2. George

Anderson also contends that George and the directors knew, as they originally alleged in their disqualification motions, that her attorneys were going to disparage Johnson & Gibbs's work product and that they could have and should have litigated that issue before Judge Tyson at the disqualification hearing in June 1995. Anderson claims that the directors' motion to disqualify before Judge Snodgrass was merely an attempt to secure another judge's determination of the very same issues Judge Tyson decided in the June 1995 hearing.

George counters that Epic's and the directors' attempts to get Anderson's attorneys to voluntarily withdraw in accordance with the local federal district court rules caused the lapse of time between the McKool firm's appearance in September 1994 and the directors' filing their motion to disqualify in April 1995. George claims that not until Pennington's deposition in March 1995, did Anderson's attorneys directly acknowledge that they would refuse to withdraw under any circumstances. George claims that the directors filed their motion to disqualify as soon as these facts became apparent.

George points out that after the federal court remanded the action to the state court, the directors promptly moved to disqualify Anderson's counsel in state court. George also asserts that the directors did not allege and litigate the disparagement of work product claim because, in a discovery response, Anderson stated that her claims did not involve disparagement of Johnson & Gibbs's legal services in 1988 and 1989. Moreover, Anderson's discovery responses stated that her claims were directed only at the director's compensation package and at Epic's sale price. George argues that it was not until the aborted trial in June 1996 that it became apparent to the directors, despite Anderson's assertions to the contrary, that Anderson was actually disparaging Johnson & Gibbs's 1988 work product. George asserts that there was a material difference between the issues in the June 1995 hearing and the October 1996 hearing. George claims the record supports the directors' position that they promptly and expeditiously asserted their disqualification claim on both occasions.

The record shows that both Judge Tyson and Judge Snodgrass expressed concern that, like Epic, the directors had waived the right to assert disqualification. However, both Judge Tyson and Judge Snodgrass heard evidence on the merits of the disqualification that George and the directors urged. Judge Snodgrass, whose order is the focus of this mandamus, did not indicate that he based his final decision on waiver. According to the record, the waiver issue as regards to the directors was hotly disputed, with conflicting interpretations of the factual circumstances. Moreover, unlike Epic, the directors did not abandon their disqualification efforts.

As a reviewing court, we may not resolve disputed factual matters in a mandamus proceeding. *See Hooks*, 808 S.W.2d at 60; *Dikeman*, 490 S.W.2d at 186–87. Because there is conflicting evidence in this case about the directors' alleged waiver, I would hold that we cannot conclude that George waived the right to complain about the trial court's disqualification ruling. *See Tenneco, Inc.*, 925 S.W.2d at 643; *Grant*, 888 S.W.2d at 468.

### IV. DISQUALIFICATION OF ATTORNEYS

On the merits of the disqualification issue, George asserts: that Epic and the directors were the clients that Johnson and Gibbs represented in 1988; that this litigation is adverse to them; that Anderson questions the validity of Johnson & Gibbs's services and work product; that the Jordaan and McKool firms possess confidential information they

gained while representing Epic and the directors in Epic's formation in violation of Rule 1.05; and that this matter is substantially related to Epic's formation in 1988.

Anderson's counsel argue that: neither Epic nor the directors, including George, were Johnson & Gibbs's clients in 1988; that AMI was the actual client; that Anderson, as assignee of Epic's claims, is not adverse to Epic; that Anderson is not questioning the validity of Johnson & Gibbs's services or work product; and that the information Anderson's attorneys possess is not confidential.

## A. Applicable Law

Disqualification is a severe remedy. *See Coker,* 765 S.W.2d at 400. Courts must adhere to an exacting standard when considering motions to disqualify to discourage their use as a dilatory trial tactic. *See Coker,* 765 S.W.2d at 399. Accordingly, the movant has the burden to establish with specificity a violation of one or more of the disciplinary rules. *See Coker,* 765 S.W.2d at 400. Mere allegations of unethical conduct or evidence showing a remote possibility of a disciplinary rule violation will not suffice under this standard. *See Spears,* 797 S.W.2d at 656; *Coker,* 765 S.W.2d at 400.

The Texas Disciplinary Rules of Professional Conduct for lawyers are not controlling as standards governing motions to disqualify. However, the rules provide guidance for determining whether a court should disqualify an attorney from representing a party in litigation. *See Henderson v. Floyd,* 891 S.W.2d 252, 253 (Tex.1995); *Spears,* 797 S.W.2d at 656. Thus, Rule 1.09 and its interpretive case law provide the guiding principles for our analysis.

The party moving to disqualify an attorney must prove: (1) the existence of a former attorney-client relationship; (2) that the at-

torney is now representing another person in a matter adverse to the former client; (3) that the attorney does not have the former client's consent[4] to represent the other person; and (4) that in the pending litigation: (a) the other person questions the validity of the lawyer's services or work product for the former client; (b) the representation in reasonable probability will involve a violation of Rule 1.05[5]; or (c) it is the same or a substantially related matter. *See* Rule 1.09; *Coker,* 765 S.W.2d at 400.

## B. Analysis

Like the waiver issue, the disqualification issue was hotly contested and the factual assertions sharply conflicting. As initially noted, George asks this Court to set aside the trial court's denial of the directors' motion to disqualify Anderson's counsel. Thus, as the movant, George has the burden to specifically prove the pertinent elements for disqualification. *See Coker,* 765 S.W.2d at 400.

### 1. Former Attorney–Client Relationship

The record shows that the parties disputed who Johnson & Gibbs represented during Epic's formation. Anderson introduced Johnson & Gibbs's internal records that showed AMI as the client, that Johnson & Gibbs billed AMI as the client, and that AMI paid Johnson & Gibbs more than two million dollars in fees for Johnson & Gibbs's services in forming Epic. On the other hand, George testified that he understood that he personally was Johnson & Gibbs's client because Johnson & Gibbs prepared and negotiated his employment compensation package with AMI. There is also evidence that after Epic's incorporation Johnson & Gibbs considered Epic as its client and that Epic paid Johnson & Gibbs's legal bills. However, when the majority completes its review of the record, its conclusion is that the only evidence in the record is that the firm did represent George

---

4. Neither party argues lack of the former client's consent. Therefore, it is not necessary to consider this element in the analysis.

5. Rule 1.05 provides that, subject to certain exceptions not pertinent here, a lawyer shall not knowingly reveal a client's or former client's

confidential information to anyone else or use such confidential information to the disadvantage of the client or former client without consent. *See* Tex. Disciplinary R. of Prof. Conduct 1.05, *reprinted in* Tex. Gov't Code Tit. 2, subtit. G app. (State Bar Rules art. X, § 9).

individually in setting up Epic. In doing so, the Court attempts to explain away the "some evidence" that AMI was in fact the client and that George as AMI's salaried employee could have been representing AMI's interest in the spin-off. The Court weighs the evidence and judges its credibility to reach its conclusion that there is no dispute in the record that the firm represented George personally. In doing so, the Court ignores its own precedent that an abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and some evidence reasonably supports the trial court's decision. *See Davis,* 571 S.W.2d at 862. Thus, there are factual disputes about a former attorney-client relationship between Epic and George and Anderson's attorneys that the Court may not resolve. See *Grant,* 888 S.W.2d at 468.

### 2. Adverse To A Former Client

There is no dispute about the adverse parties element. Anderson and George are adverse parties. However, because George cannot meet the other pertinent elements, this fact does not affect my decision. *See Coker,* 765 S.W.2d at 400.

### 3. Challenge To Johnson & Gibbs's Work Product

Anderson asserts that she and her attorneys are not challenging Johnson & Gibbs's 1988 services or work product. She claims that in the aborted trial she merely asserted that the merger agreements permitted payments to the directors that the 1988 documents did not permit. Anderson testified on direct examination that she had no complaint about the way Epic was structured in 1988. Anderson asserts that her lawyers were not breaching confidences because the documents were either in the public domain because of the SEC filings or were furnished without objection during discovery before the aborted trial in June 1996. George counters that the record clearly shows that Anderson was disparaging Johnson & Gibbs's services and the firm's work product. George also claims that Anderson's lawyers are breaching confidences learned when they were members of Johnson & Gibbs in 1988, thereby violating Rule 1.05.

The Court recognizes that there is conflicting evidence about the substantial relationship and confidentiality elements of Rule 1.09. Again, because the record shows these factual disputes, we cannot say that the trial court abused its discretion by denying the directors' disqualification motion. *See Grant,* 888 S.W.2d at 468; *Beaumont Bank, N.A.,* 806 S.W.2d at 226.

### V. ON THE ROAD AGAIN[6]

Once again, the Court has ignored well established precedent governing the standards of review of a trial court's discretionary decision and improperly conducted a factual sufficiency review of this mandamus record. Additionally, the Court has improperly judged the credibility of the evidence before the trial court. The Court fails to keep in mind that the Court may not substitute its judgment for that of the trial court. *See Walker,* 827 S.W.2d at 839; *Flores,* 777 S.W.2d at 41–42. This Court may not reverse the trial court's judgment merely because it disagrees with the trial court's decision if that decision was within the trial court's discretionary authority. *See Beaumont Bank N.A.,* 806 S.W.2d at 226. The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence reasonably supports the trial court's decision. *See Davis,* 571 S.W.2d at 862. The Court clearly and unequivocally ignores this precedent and regrettably so. In my view, under this record and under applicable mandamus standards, the Court cannot conclude an abuse of discretion exists. This decision is yet another mile marker down the road of no return where the Court ignores its own rules and precedent. *See In re Ford Motor Co.,* —— S.W.2d ——, 1998 WL 387537 (Tex.1998) (Baker, J., dissenting).

### VI CONCLUSION

Under this record, I would hold that Epic abandoned its disqualification efforts and, thereby, waived its ability to complain about

---

**6.** *See In re Ford Motor Co.,* ——. S.W.2d —— (Baker, J., dissenting).

Anderson's attorneys. I agree that George did not waive his efforts to have Anderson's attorneys disqualified. Nevertheless, because of the deference this Court should give to the trial court's resolution of factual matters in a mandamus proceeding, I would hold that the trial court did not abuse its discretion in refusing to disqualify Anderson's counsel. Accordingly, I would deny both Epic and George's petitions for mandamus.