COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-386-CV

 

 

IN RE DANIEL SHARPLIN, JR.                                                   RELATOR

 

                                              ------------

 

                                    ORIGINAL
PROCEEDING

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








In one issue in his petition
for writ of mandamus, Relator Daniel Sharplin, Jr. contends that the 236th
District Court of Tarrant County abused its discretion by denying Sharplin=s motion to disqualify the law firm Kelly, Hart & Hallman, P.C.
(KHH) from representing real party in interest Southwest Environmental
Services, Inc. (Southwest) in the underlying case when a KHH lawyer, Robert T.
Stewart, as part of his past employment and pursuant to a joint defense
agreement and the joint defense privilege, obtained confidential information in
a prior case concerning matters substantially related to the matters raised in
the underlying case.  Because we hold
that the trial court abused its discretion by denying Sharplin=s motion to disqualify KHH, we conditionally grant the writ of
mandamus.

 I.  Background Facts

A. 
Stewart Represented Tanknology/nde International, Inc. 

(Tanknology) When Sharplin Was its President and
Engaged in 

Confidential Communications with Sharplin in
Connection with a Federal Prosecution of Tanknology.

 

Sharplin worked for
Tanknology and its predecessor company from 1991 to 2000, serving as president
from 1995 to 2000.  He was a consultant
to the company from 2000 to 2003.  During
Sharplin=s association with the company, Tanknology was the largest underground
fuel storage tank (UST) testing company in the United States.  While Sharplin was its president, Tanknology
performed testing services on USTs, installed and monitored automatic tank
gauges (ATGs), which monitor leaks in USTs and aboveground tanks, and provided
compliance management services involving USTs.








In 1998, during Sharplin=s presidency, federal agencies began to investigate the Tanknology
division that performed UST testing services. 
Although Sharplin was not identified as a target of the investigation,
he retained Haynes and Boone law firm to represent him personally.  Robert T. Stewart, who was with Baker Botts
at the time, represented Tanknology.

During the course of the
investigation and the pendency of the criminal case, Sharplin spent from five
to sixty hours per week for about thirty months with Stewart, providing Stewart
with information about Athe
following issues regarding [USTs] and aboveground storage tanks: applicable
regulatory standards, regulatory enforcement, leak detection alternatives,
third-party certifications, intrinsic safety for leak detection alternatives,
regulatory compliance alternatives, quality control, and [his] management of
Tanknology in keeping with [his] interpretation of these issues.@  Sharplin never gave anyone
permission to disclose the confidential information he gave Stewart.     Following the federal investigations, U.S.
attorneys in ten federal districts in nine different states filed charges
against Tanknology, alleging that it had performed false services at various
federal facilities across the country. 
In August of 2002, Tanknology, pursuant to a plea agreement, pleaded
guilty to ten felony counts of presenting false claims and making false
statements to federal agencies during Sharplin=s presidency.

 

 








B.  Stewart
Joined KHH, Which Later Appeared as Co-counsel for Southwest in the Underlying
Suit Against Sharplin.

 

At some point after the Tanknology prosecution concluded in August of
2002, Stewart left Baker Botts and joined KHH. 
Stewart had been a director with KHH for approximately two years when
KHH appeared as co-counsel for Southwest in its underlying lawsuit against
Sharplin.

 

C.  Southwest
Filed the Underlying Suit Against Sharplin.

 

In September 2001, Southwest,
which manufactures and sells ATGs, entered into a sublicensing agreement with
USTest, another underground fuel storage tank testing company controlled by
Sharplin.  The agreement gave Southwest
either a limited or an exclusive right, depending on which party=s interpretation of the agreement is correct, to manufacture and sell
a particular model of an ATG.  By early
2002, a dispute had arisen concerning the parties= rights and obligations under the agreement.  A lawsuit was filed in Travis County, which
the parties later resolved through a written settlement agreement.








The acrimony between
Southwest and USTest continued, however, and in October 2003, Southwest, which
was then only represented by Robert F. Bodoin, filed the underlying suit
against Sharplin, USTest, and related defendants in Tarrant County, seeking,
among other things, declaratory relief concerning its rights under the
sublicensing and settlement agreements and alleging defamation, breach of
contract, and tortious interference with business relations.

D.  KHH
Appeared as Southwest=s Co-counsel Shortly after the Underlying Suit Was
Specially Set for Trial.

 

On July 8, 2005, the trial
court specially set the case for trial on September 12, 2005.  Less than two months after notice of this
special setting, on August 26, 2005, KHH appeared as co-counsel for
Southwest.  After KHH appeared as
Southwest=s
co-counsel, the trial court postponed the September 12 setting and reset the
case for trial on November 7, 2005.

E.  Shortly
after KHH Appeared as Southwest=s Co-counsel, Southwest=s Theory of the Case Began to Change. 

 








After KHH appeared as
Southwest=s
co-counsel, the focus of Southwest=s pleadings and discovery began to change.  Southwest for the first time asserted
complaints involving regulatory compliance, safety, and quality control issues,
accusing SharplinCand the
other defendants allegedly controlled by himCof criminal acts and disclosing evidence related to Sharplin=s prior employment with Tanknology, a convicted felon.  For example, on October 10, 2005, Southwest
supplemented its discovery responses to allow its expert to talk about the
defendants= code
violations and revealed information, such as that found in electronic mail, that
Southwest had about Sharplin=s past as the president of Tanknology. 
Then, on October 19 and 21, 2005, Southwest deposed a customer of one of
the defendants, asking questions concerning whether the ATGs sold by the defendants
met local and state regulations, whether the ATGs worked as leak detection
devices, and whether Sharplin had given the customer false information.  Later, on October 24, Southwest submitted its
original exhibit list, including as trial exhibits various state laws, national
fire codes, and municipal fire codes, some of which provide for the imposition
of criminal penalties, including confinement. 
On October 31, Southwest filed its fifth amended petition, alleging
among other claims that Sharplin and the other defendants had failed Ato use their best efforts to maintain the high reputation of USTest.@

F.  Sharplin
Discovered Stewart=s Association with KHH and

Requested That KHH Be Disqualified from Representing Southwest. 

 

On or about October 24, 2005,
Sharplin=s attorney learned that Stewart was a KHH director.  Upon learning of Stewart=s association with KHH, Sharplin asked Southwest to agree not to offer
any evidence or jury argument concerning Tanknology, the Tanknology criminal
matter, or theories related thereto. 
Southwest, however, refused.  On
October 28, Sharplin requested in writing that KHH withdraw from the case.  KHH refused. 
On November 1, Sharplin filed an emergency motion to disqualify KHH.








After a hearing, the trial
court denied Sharplin's motion on November 4, 2005.  Later that same day,  Sharplin filed this petition for mandamus and
an emergency motion seeking a stay of proceedings below.  On November 7, 2005, we granted the emergency
motion and stayed all proceedings until further order of this court.

II.  Law and Analysis

In one issue, Sharplin
contends that the trial court abused its discretion by denying his emergency
motion to disqualify KHH from representing Southwest because Stewart obtained
confidential information from Sharplin in the Tanknology case that concerns matters
substantially related to matters raised in the underlying case.

A.  Joint
Defense Privilege

Sharplin's emergency motion
to disqualify KHH is based on the joint defense privilege.








[T]he
joint defense privilege is part of the attorney client privilege recognized in
Texas Rule of Evidence 503.  Under
subsection 503(b)(1)(C), the Ajoint‑defense@
privilege protects Aconfidential
communications made for the purpose of facilitating the rendition of legal
services . . . by the client or a representative of the client, or the client=s
lawyer or a representative of the lawyer, to a lawyer or a representative of a
lawyer representing another party in a pending action and concerning a matter
of common interest therein.@[2]

 

In an
affidavit filed in support of his motion to disqualify KHH, Sharplin contends
that he, Tanknology, and their respective lawyers entered into a joint defense
agreement in which he agreed to provide information about the Tanknology matter
Awith the agreement that Tanknology and its lawyers would not disclose
the information@ without his
consent.  Southwest, however, objects to
Sharplin=s affidavit on the ground that it is conclusory and, therefore, does
not constitute competent proof of the agreement.[3]  We disagree. 

The relevant
portions of Sharplin=s affidavit
are set out below:

2.     I was employed by
Tanknology . . . from approximately 1991 to 2000.  From 1995 to 2000, I served as President of
Tanknology.  From 2000 to 2003, I served
as a consultant to Tanknology.  This
affidavit is based on my knowledge as an employee, officer and consultant of
Tanknology.








. . . . 

 

4.     In approximately 1998,
various branches of the federal government began an investigation of the
division of Tanknology that performed tank testing services.

 

5.     On August 29, 2002,
Tanknology entered into a plea agreement in which it pled guilty to ten felony
counts of presenting false claims and making false statements to federal
agencies.

 

6.     During the course of the
federal investigation and through the negotiating and entering of the plea
agreement, Tanknology was represented by Robert T. Stewart (AStewart@) and
Edward Tomko (ATomko@).  At the time, Stewart and Tomko were partners
in the law firm of Baker & Botts. 
Stewart, who worked in Austin, was the Tanknology lawyer with whom I
dealt . . . most often.  I recently
learned that Stewart now is a shareholder in the Austin office of [KHH].

 

7.     I was never charged with
any criminal wrongdoing in connection with the government=s
investigation into Tanknology, nor was I ever notified that I was a target of
the criminal investigation.  However, I
did retain my own counsel, Barry McNeil and Ronald Breaux of the Dallas office
of Haynes & Boone.

 

8.     During the course of the
investigation and criminal case, Mr. Breaux and I worked extensively with
Tanknology and their attorneys, Stewart and Tomko.  Over the course of approximately thirty
months, I spent between approximately five to sixty hours per week with Stewart
at his office, at which time I provided extensive confidential information to
Stewart.  Specifically, I provided
information to Stewart about the following issues regarding [USTs] and above
ground storage tanks:  applicable
regulatory standards, regulatory enforcement, leak detection alternatives,
third party certifications, intrinsic safety for leak detection alternatives,
regulatory compliance alternatives, quality control, and my management of
Tanknology in keeping with my interpretation of these issues.

 








9.     I provided this information under the
protection of the joint defense privilege and a joint defense agreement that I
and my counsel entered into with Tanknology and its counselCthe Baker & Botts firm, with the agreement that Tanknology and its
lawyers would not disclose this information to anyone without my
permission.  I have never given Stewart,
Baker & Botts, or anyone else permission to disclose the information given
to Stewart in confidence.








This affidavit
does more than merely conclude that an agreement exists.  It contains underlying facts, such as the
names of the parties, the time frame of the agreement, the information it
covered, and the confidentiality clause, it is credible, and it is susceptible
to being readily controverted.[4]  Moreover, Southwest has never attempted to
controvert the affidavit.  Instead,
Southwest has assumed for the purpose of its arguments on appeal that an
agreement exists.  We, therefore, reject
Southwest=s argument
that the affidavit is conclusory and accept as true Sharplin's averments that a
joint defense agreement exists between him and Stewart.[5]  Even assuming the absence of an express
agreement, the Supreme Court of Texas made clear in Godbey that the
implicit duty to protect the nonclient=s confidences is no less binding than a duty undertaken expressly.[6]

B.  Test
for Lawyer Disqualification

Whether KHH should be disqualified from
representing Southwest in the underlying matter turns on whether Stewart could
properly represent Southwest.  KHH is not
disqualified from representing Southwest unless Stewart would be; if Stewart
would be disqualified, then KHH must be disqualified as well.[7]  As the Supreme Court of Texas explained in Godbey,


 

There is, in
effect, an irrebuttable presumption that an attorney in a law firm has access
to the confidences of the clients and former clients of other attorneys in the
firm.  One reason for this presumption is
that it would always be virtually impossible for a former client to prove that
attorneys in the same firm had not shared confidences.  Another reason for the presumption is that it
helps clients feel more secure.  Also,
the presumption helps guard the integrity of the legal practice by removing
undue suspicion that clients= interests are not being fully protected.[8]

In Coker,
the Supreme Court of Texas explained how to determine when disqualification of
counsel is proper:








[T]o prevent a motion to disqualify counsel from being used as a
dilatory tactic, trial courts must strictly adhere to an exacting standard when
considering such motions.   When
contemplating whether disqualification of counsel is proper, the court must
determine whether the matters embraced within the pending suit are substantially
related to the factual matters involved in the previous suit.

 

The severity of the remedy requested requires the movant to establish
a preponderance of the facts indicating a substantial relation between the two
representations.  The moving party must
prove the existence of a prior attorney‑client relationship in which the
factual matters involved were so related to the facts in the pending litigation
that it creates a genuine threat that confidences revealed to his former
counsel will be divulged to his present adversary.  Sustaining this burden requires evidence of
specific similarities capable of being recited in the disqualification
order.  If this burden can be met, the
moving party is entitled to a conclusive presumption that confidences and
secrets were imparted to the former attorney. 
In this manner, the movant is not forced to reveal the very confidences
he wishes to protect.  By proving the
substantial relationship between the two representations, the moving party
establishes as a matter of law that an appearance of impropriety exists.  Although the former attorney will not be
presumed to have revealed the confidences to his present client, the trial
court should perform its role in the internal regulation of the legal
profession and disqualify counsel from further representation in the pending
litigation.[9]









In
determining whether the factual matters in the pending suit are substantially
related to the matters in the previous suit, the factual matters Ado[] not need to be >relevant= in the
evidentiary sense . . . .  [They] need
only be akin to the present action in a way reasonable persons would understand
as important to the issues involved.@[10]

[T]wo matters are Asubstantially related@ . .
. when a genuine threat exists that a lawyer may divulge in one matter
confidential information obtained in the other because the facts and issues
involved in both are so similar. . . . An actual disclosure of confidences need
not be proven;  the issue is the
existence of a genuine threat of disclosure because of the similarity of the
matters.[11]

 

C.  The
Specific Similarities Between the Cases

The evidence
at the disqualification hearing showed the following specific similarities
between the factual matters involved in the Tanknology case, during the
pendency of which Sharplin shared confidences with Stewart, and the factual
matters involved in the underlying suit brought by Stewart=s law firm on behalf of Southwest against Sharplin:

1.  Sharplin is a Dominant, Controlling Figure in
the Operation of the Corporations Involved in the Prior Case and in the
Underlying Case.

 








Sharplin was
the president of Tanknology when Tanknology committed the criminal offenses for
which it was convicted in the prior criminal case and during the federal
investigation of those offenses.  He was
still a consultant to Tanknology when Tanknology entered into the plea
agreement.  Although he was never
targeted by the investigation,  Sharplin
was potentially liable for Tanknology=s criminal acts because of his role within the company.[12]

Excerpts
from Southwest expert Robert C. Scott=s electronic mail, produced to Sharplin after KHH entered the case as
Southwest=s
co-counsel,  include an article about the
Tanknology offenses and the plea agreement that Mr. Scott forwarded to
Southwest personnel.  Also included in
the electronic mail excerpts is a reply from Mike Gibson, the president of
Southwest, AThis is the
company that Dan Sharplin was president of and forced to resign from last year
before buying USTest,@ and a
response from Mr. Scott, ASo he done
it, huh!@








In the
underlying case, Southwest sued Sharplin individually and alleged that the
remaining defendants are controlled by Sharplin.  Southwest=s arguments in the trial court show the focus on Sharplin and his
character in the lawsuit:

[Trial Court]:  Is the defendant concerned that plaintiff is
going to assert that the defendants are seeking to skirt the law with the --
the gadget in question in here just like they did with Tanknology? . . . 

 

[Sharplin=s
counsel]:  I suspect, being the good
advocates that I know them to be, I could hear it, here we go again ladies and
gentlemen of the jury, Dan Sharplin is at it again.

[Southwest=s
counsel]:  Your Honor, we have offered
not to make that argument if they would withdraw this motion to no avail . . .
.

 

[Trial Court]:  . . . . [W]hen you said you don=t
intend to offer that, are you talking about in essence to what the Court said
about skirting the law or avoiding --

 

[Southwest=s
counsel]:  Correct.

[Trial Court]:  Cthat kind of thing?

[Southwest=s
counsel]:  We believe . . . that the
prior claims made against Tanknology by the federal government although
arguably probative would probably be outweighed by . . . the prejudice, and . .
.  there is not a sufficient enough nexus
to . . . tie the two.

 

Southwest=s
counsel continued, 

 

Your Honor, it is Mr. Sharplin=s contention that his desire
to . . . protect the confidentiality of the documents . . . led him not to give
us anything, not one jot or tittle of technology necessary to build this
device.  It was his desire to maintain
the good will of USTest.  That=s a
bogus reason.  What he wanted to do was
keep our $50,000 and give us nothing.








 

. . . . 

 

[Sharplin=s
counsel]:  And the record will not pick
up the forcefulness and the effectiveness that [Southwest=s
counsel] just made those arguments about what Mr. Sharplin C

 

[Trial Court]:  I think you just established that.

 

2.  Both Cases Involve Allegations of Wrongdoing
by Sharplin-controlled Corporations in the Area of USTs, Testing, and Leak
detection.

 

a.  Fraud by Sharplin-controlled Corporations 

Is Alleged in Both Cases.

 

Evidence at
the disqualification hearing showed that Tanknology pleaded guilty to ten
felony counts of presenting false claims and making false statements to federal
agencies.  The criminal acts included
violating Arequired
test protocols@ and
submitting false data.

Further,
articles that Southwest produced to Sharplin in discovery and listed as trial exhibits
discuss allegations that Tanknology duped the government in its plea
negotiations.  Specifically, an Austin
Business Journal provides, 

The U.S. Attorney=s
Office in Austin claims Tanknology misled federal investigators by luring them
into levying the fines against a shell corporation and by using the bankruptcy
process to shield Tanknology=s two moneymaking businesses.

 

. . . .

 








In court documents, Daniel
Castillo, an assistant U.S. attorney in Austin, alleges that during the entire
course of Tanknology=s
criminal case, executives at the company led the federal government to believe
that . . . the shell company was responsible for the crimes and that it was
able to meet the terms of the negotiated plea agreement.

 

Castillo claims in court
papers that federal investigators were misled throughout the criminal process
and that the scheme to skirt the fines using the bankruptcy process was
premeditated.

 

. . . . 

 

ARegardless of which
Tanknology entity is ultimately responsible,@ [Austin bankruptcy attorney
Joseph Martinec] says, Athe
company already admitted that they cheated the government and taxpayers, so
that fact could look bad in front of a jury.@

 

In the
underlying case filed by Southwest, the live petition includes the allegation
that Athe Sharplin-controlled Defendants have used their corporate form to
perpetrate a fraud.@  Additionally, excerpts from Southwest=s depositions of the defendants= clients taken after KHH became Southwest=s co-counsel show that Southwest=s lawyers were focused on the issue of whether Sharplin defrauded his
clients by telling them that the ATGs would test for leaks and that they had a
third-party certification attesting to their safety, such as an Underwriters
Laboratory Listing.  Here, for example,
are some excerpts from Eugene Clancy=s deposition:

Q.     . . . [Y]ou paid $3900.00 times 70 for a product that doesn=t
work.  Is that a fair statement?

 








. . . .

 

Q.     If my calculations are correct, you paid almost $300,000 to Site
Controls for a product that gives you very little information; is that correct?

 

. . . .

 

Q.     Okay. . . . [W]as it represented to you by Dan Sharplin or
anyone associated with Site Controls that the ATG . . . would be capable . . .
of doing a leak detect test?

 

. . . .

 

Q.     . . . .  Have you ever
placed an order based upon someone=s representation from Site
Controls or any other company that you know is associated with Dan Sharplin . .
. that the [ATG] which you were ordering would satisfy . . . compliance
requirements to do a leak detection test?

 

. . . . 

 

Q.     . . . .  Do you know whether
or not the [ATGs] and the electrical apparatus that have been installed . . .
by Site Controls or any entity related to Dan Sharplin has ever received an
Underwriters Laboratory listing?

 

Q.     . . . .  When you first
allowed the installation in 2003 of any Site Control [ATG] in an [UST], did you
understand that the [ATG] had Underwriters Laboratory listing status?

 

. . . . 

 

Q.     And by Athey@ told
you it did, would that be Dan Sharplin or someone associated with him?

 

A.     That=s
correct.

 








Q.     Who, other than Dan Sharplin, may have told you that it had
Underwriters Laboratory listing status, the [ATG]?

 

A.     I couldn=t be
certain of where I heard it at.

 

. . . . 

 

Q.     Okay.  And would the most
likely person that you asked that question [of] have been Dan Sharplin?

 

A.     I would say yes.

 

Q.     Okay.  And when . . . you
asked . . . whether or not the [ATG] manufactured by Site Controls met all the
requirements to go in an . . . [UST], was . . . 
the answer that you received Ayes@?

 

A.     Yes.

 

Q.     Okay.  Now, have you ever
learned from any source that, in fact, the [ATG] manufactured by Site Controls
does not have . . . Underwriters Laboratory listing status?

 

. . . .

 

Q.     Okay.  Now, did anyone
ever tell you that the Site Controls [ATG] had third-party certification?

 

. . . .

 

Q.     Is . . . that [exhibit 2 at the deposition] what you understand
to be the third-party certification for the [ATGs] manufactured by Site
Controls?

 

A.     Yes.

 

Q.     Was that furnished to you by Dan Sharplin . . . ?

 

A.     Yes, I believe so.








Q.     Is there any person other than Dan Sharplin that could have
furnished Exhibit 2 to you?

 

. . . . 

 

Q.     Okay.  And is . . . it
your best recollection today that you asked him for proof of the . . .
third-party certification of the Site Controls manufactured [ATG] and that he
furnished you Exhibit 2 in response?

 

A.     Yes.

 

. . . . 

 

Q.     . . . .  Will you tell us
whether . . . you believed, upon receipt of Exhibit 2, that the third-party
certification given by Ken Wilcox for the Site Controls manufactured [ATG]
carried with it the fact that the [ATG] manufactured by Site Controls had a
listing with Underwriters Laboratory?

 

. . . . 

 

Q.     Okay.  And the person who
led you to that belief was who?

 

A.     I would say Dan Sharplin.

 

The
following exchange between KHH counsel and the trial court also shows that both
the Tanknology case and the underlying case involve fraud allegations:

[KHH:]       Here, the criminal entity, Tanknology, who was represented by
Baker & Botts when Mr. Stewart was there . . . , engaged in the simple
illegal practice of filing false claims with the federal government, claiming
they had done work that they did not do.

 








Now, as I heard [Southwest=s
counsel] describe what=s
involved in this case, that has absolutely nothing to do with those matters
that happened some years ago.  And C

 

[The Court]:        Plaintiffs are going to allege simple
little fraud in this one?

 

[KHH:]       Well, not as simple as that fraud was.  Not as simple as just simply filing false
claims claiming you did work that you didn=t do.  I mean, that=s
about as simple a fraud [as] you can get when you=ve
got multiple felony counts on you.

 

b.  Criminal Behavior of Sharplin-controlled 

Corporations Is at Issue
in Both Cases. 

 

After KHH
appeared as co-counsel, Southwest placed on its trial exhibit list an article
from CSP Daily News Flash that contains information about Tanknology=s offenses and plea bargain. 
Specifically, the article provides that Tanknology agreed to plead
guilty to ten felony counts of presenting false claims and making false
statements to federal agencies, to pay a $1 million criminal fine, and to pay
$1.29 million in restitution.  The
article also provides that Tanknology would be on probation for five years and
would@ implement a quality management system to ensure that false and
improper testing practices do not occur again.@  Before the agreement, the
corporation had Afailed to
implement quality assurance that could have prevented invalid testing
practices.@








In the
underlying case, Southwest placed certain sections of the water code on its
trial exhibit list that describe offenses and criminal penalties related to
Southwest=s allegations
about Sharplin=s
misconduct.  One section, section 7.148,
provides that a person commits an offense if he Aintentionally or knowingly tampers with, modifies, disables, or fails
to use pollution control or monitoring devices, systems, methods, or practices
. . . .@[13]  Another of the listed
sections, section 7.149, provides that a person commits an offense if he Aintentionally or knowingly makes or causes to be made a false material
statement, representation, or certification in, or omits or causes to be
omitted material information from, an application, notice, record, report,
plan, or other document, including monitoring device data, filed or required to
be maintained by Chapter 26 or by a rule adopted or a permit or an order issued
by the appropriate regulatory agency under Chapter 26.@[14]  Finally, another listed
section, section 7.187, provides the range of punishment, including confinement
of up to thirty years.[15]








At the
hearing, Southwest=s counsel
explained the importance of Tanknology=s criminal activities and the alleged criminal activities of Sharplin
and corporations currently controlled by him to the underlying civil case:

We believe that the prior claims made against Tanknology by the
federal government although arguably probative would probably be outweighed by
the . . . prejudice, and . . . there is not a sufficient enough nexus to . . .
tie the two.  . . . The thrust of our
argument is this[:]  that Dan Sharplin
and his entities have breached the sublicensing agreement from the outset and .
. . in sundry different ways.  

 

The primary -- [o]ne of the
ways, and only one of them, is that the sublicensing agreement obligated USTest
to use its best efforts to maintain the high reputation of the USTest 2001
[ATG].  The defendant is making a product
that utilizes the exact same [ATG], data card, [and] circuit board [and] uses
the exact same probe and [is] installing [it] unlawfully in tanks without any .
. . listing whatsoever from any approved regulatory agency.  . . .

 

. . . [A]ll of those tanks,
all of the gauges that they have installed throughout Texas and Oklahoma . . .
and throughout the west . . . do not comply with the fire codes.  Their own expert admits that.  And that=s . . . the regulatory
violation that . . . exists.

 

As Sharplin=s counsel pointed out in the hearing, the statutes that Southwest
included in its trial exhibits discuss criminal penalties including
incarceration.  And, as Sharplin=s counsel argued in the hearing, 








[F]rom Mr. Sharplin=s perspective, . . . if you
consider that Mr. Stewart is sitting at this table and cross-examining Mr.
Sharplin on . . . what he did with this product, . . . and how he considered --
how he construes the water code, whether he thinks he=s in
big trouble with that[, y]ou have to assume that Mr. Stewart has all kinds of
knowledge about how Mr. Sharplin thinks, how he views things, how he views
these particular statutes at issue.

 

3.  Both
Cases Focus on the Danger That the Activities of the Sharplin- controlled
Corporations Could Result in Explosions.

An American-Statesman
article from Southwest expert Scott=s electronic mail, produced by Southwest in discovery after KHH
appeared as Southwest=s
co-counsel, explains that the tests performed by companies such as Tanknology Acheck for leaks that can cause health and environmental risks, such as
contamination of soil and ground water, and can potentially lead to explosions.@

The CSP
Daily News Flash article produced by Southwest in discovery and included on
Southwest=s trial
exhibit list submitted after KHH appeared as co-counsel associates Tanknology=s offenses with risks to the public. 
Specifically, the article includes a quotation from former EPA
Administrator Christie Todd Whitman, ACompliance with the . . . requirements is dependent upon accurate
information.  Those who knowingly place
the public and environment at risk by false testing must and will be
prosecuted.  False testing at [UST
locations] presents grave risks and is unacceptable,@ and a quotation from Tom Sansonetti, Assistant Attorney General of
the Justice Department=s
Environment and Natural Resources Division, ATanknology was prosecuted and has been held responsible for fraudulent
practices that could cause a risk of significant environmental harm at federal
facilities.@








In the
underlying case, Southwest=s counsel spoke at the hearing about the danger of explosions in
connection with the allegations levied against Sharplin and Sharplin-controlled
corporations in Southwest=s petition:

[T]he sublicensing agreement obligated USTest to use its best efforts
to maintain the high reputation of the USTest 2001 [ATG].  The defendant is making a product . . . and
installing [it] unlawfully in tanks without any . . . listing whatsoever from any
approved regulatory agency.  It could
blow them up.  That could hardly be
considered using the best efforts to maintain the good will. . . .  That=s the safety issue here.

 

. . . [A]ll of those tanks,
all of the gauges that they have installed throughout Texas and Oklahoma and .
. . throughout the west . . . do not comply with the fire codes.  . . . [O]ne blow[] up, one explosion of these
gauges using the same USTest 2001 technology could hardly . . . benefit either
party.

 

III.  The
Trial Court Abused its Discretion by Not Disqualifying KHH.








Based on our
analysis of the issues involved in both cases, we hold that there are
sufficient similarities between the factual matters involved in the Tanknology
case and those involved in the underlying case such that a reasonable person
would believe that the issues involved in the Tanknology case are important to
the issues involved in the underlying case.[16]  At the hearing, Southwest=s own counsel recognized that the prior claims made against Tanknology
by the federal government are Aarguably probative@ to the claims made by Southwest against Sharplin in the underlying
case.  As demonstrated above, the
similarities between the two cases are clearly specific enough to be recited in
a disqualification order.[17]

The Tanknology
case involved claims that a Sharplin-controlled company committed fraud, broke
criminal laws, and put people at risk of explosions by not performing the
testing required to prevent leaks.  After
KHH appeared as Southwest=s co-counsel
in the underlying lawsuit, it too has evolved into a case in which Sharplin and
Sharplin-controlled defendants have been accused in one form or another of
fraud, violating criminal laws, and putting the public at risk by failing to perform
the testing required to prevent leaks. 
At the hearing on Sharplin=s motion to disqualify KHH, Southwest=s counsel openly acknowledged that he and KHH contemplated arguing that
Sharplin was attempting to Askirt the law@ in its
dealings with Southwest just like he did with Tanknology.  Under these facts, the trial court had no
discretion to allow KHH to continue representing Southwest, and, therefore, we
hold that the trial court abused its discretion by not disqualifying KHH.

IV.  Miscellaneous
Arguments Raised by Southwest








We reject
Southwest=s
contentions that Sharplin filed his motion to disqualify KHH as a dilatory
tactic and that the motion was untimely filed, thereby waiving the
complaint.  Sharplin=s counsel represented to the trial court at the hearing that he first
learned that Stewart was with KHH on or about October 24, 2005, less than two
months after KHH=s initial
appearance as Southwest=s
co-counsel.  Within eight days of
learning the information, Sharplin=s counsel had a telephone conversation with KHH about the issue,
requested in writing that KHH withdraw from the case, and filed an emergency
motion to disqualify KHH.  Further, we do
not see how the evidence that Southwest points to regarding alleged dilatory
tactics before KHH appeared as counsel for Southwest could be pertinent
to this issue.








Finally, we
reject Southwest=s argument,
based on Metropolitan Life Insurance Company v. Syntek Finance Corporation,[18]
that information in the public domain, such as most of the material in the
Tanknology exhibits and all the relevant code provisions, cannot support
disqualification.[19]  It is not the information in the articles or
the elements of the statutes that have the potential to harm Sharplin.  Rather, it is the information and elements
coupled with Sharplin=s
confidences to Stewart about Athe . . . issues . . . and [his] management of Tanknology in keeping
with [his] interpretation of these issues@ that have the potential to cast Sharplin in the same unflattering
light as the felon he once controlled. 

 

 

 

 

 

V.  Conclusion

We lift our
stay of all proceedings below and conditionally grant a writ of mandamus
directing the trial court to vacate its November 4, 2005 order denying the
motion to disqualify KHH and to render an order disqualifying KHH from further
participation in the underlying case.  We
are confident that the trial court will do so in a timely manner; our writ will
issue only if the trial court does not.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL A:   CAYCE, C.J.; DAUPHINOT
and MCCOY, JJ.

DELIVERED:  August 3, 2006











[1]See Tex.
R. App. P. 47.4.





[2]In re
Skiles, 102 S.W.3d 323, 327 n.2 (Tex. App.CBeaumont
2003, orig. proceeding); see also United States v. McPartlin, 595 F.2d
1321, 1337 (7th Cir.) (cited in Nat=l Med. Enters., Inc. v. Godbey, 924 S.W.2d 123, 129 (Tex. 1996)
(orig. proceeding)), cert. denied, 444 U.S. 833 (1979); In re
Monsanto, 998 S.W.2d 917, 922 (Tex. App.CWaco 1999, orig. proceeding).





[3]See Ghidoni
v. Stone Oak, Inc., 966 S.W.2d 573, 579 (Tex. App.CSan Antonio 1998, pet. denied) (op. on reh=g) (en banc) (holding
that Athe
movant [in a disqualification hearing] may not rely upon conclusory statements
but must >provide
the trial court with sufficient information so that it can engage in a
painstaking analysis of the facts.  While
a movant need not divulge any confidences, he must delineate with specificity
the subject matter, issues and causes of action presented in (the) former
representation=@)
(citations omitted).





[4]See Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996)
(providing that a conclusory statement is not credible or susceptible to being
readily controverted); Rizkallah v. Conner, 952 S.W.2d 580, 587 (Tex.
App.CHouston [1st Dist.] 1997, no writ)
(providing that a conclusory statement does not contain the underlying facts to
support it); see also NCNB Tex. Nat=l Bank v. Coker, 765 S.W.2d 398, 400 (Tex. 1989)
(providing that the movant seeking disqualification is not required to reveal
specific confidences involved in the conflict).





[5]See Tex. R.
App. P. 38.1(f) (AIn a civil case, the court will
accept as true the facts stated unless another party contradicts them.@).





[6]See Godbey, 924 S.W.2d at 130-31.





[7]See id. at 128-29.





[8]Id. at 131.





[9]765 S.W.2d at 399-400 (citations
omitted); see also Tex.
Disciplinary R. Prof'l Conduct 1.09(a)(3), reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G
app. A (Vernon 2005) (Tex. State Bar R. art. X, ' 9) (providing that absent consent,
a lawyer shall not represent a party adverse to a former client in Athe same or substantially related
matter@).





[10]In re Corrugated Container
Antitrust Litig.,
659 F.2d 1341, 1346 (5th Cir. 1981), overruled on other grounds by
Gibbs v. Paluk, 742 F.2d 181 (5th Cir. 1984); Ghidoni, 966 S.W.2d
at 602.





[11]In re Epic Holdings, Inc., 985 S.W.2d 41, 51 (Tex. 1998)
(quoting Texaco, Inc. v. Garcia, 891 S.W.2d 255,
256 (Tex. 1995)).





[12]See Godbey, 924 S.W.2d at 124 (AA corporation acts only through its
human agents, but its liability for their misconduct does not absolve the
agents from individual liability.@).





[13]Tex. Water
Code Ann.' 7.148 (Vernon 2000).





[14]Id. ' 7.149.





[15]Id. ' 7.187.





[16]See Corrugated Container Antitrust
Litig., 659 F.2d
at 1346; Ghidoni, 966 S.W.2d at 602.





[17]See Coker, 765 S.W.2d at 400.





[18]881 S.W.2d 319 (Tex. 1994).





[19]See id. at 321.